Mississippi State Highway Commission *v.* Pepper

No. 43098 June 8, 1964 164 So. 2d 911

*Tate Thigpen, G. B. Keaton,* Picayune; *Joe T. Patterson,* Attorney General, Jackson, for appellant.

*Williams* & *Williams*, Poplarville, for appellee.

BRADY, TOM P., J.

This is an appeal by the Mississippi State Highway Commission from a judgment of the Circuit Court of Pearl River County rendered in favor of H. H. Pepper for the sum of $97,550 as compensation and damages for the taking of a strip of land containing 35.92 acres of land to be used for highway right-of-way purposes in the construction of a new interstate highway running through and across the appellee's land. This highway is a relocation and construction of Mississippi Highway No. 11 and will be known as the New Interstate Highway No. 59, and it is a limited or non-access highway.

A special court of eminent domain was organized according to the law and trial had therein on June 29, 1962, in the courthouse of Pearl River County in the City of Poplarville, Mississippi. Luther M. Smith, Justice of the Peace of District 1 in Pearl River County, Mississippi, was presiding. The jury award of $85,000 was received and entered and the appellant herein took an appeal to the Circuit Court of Pearl River County. This cause came on for trial in the circuit court of said county at the regular March 1963 term thereof, and trial was had on March 25th and 26th, 1963, on a jury verdict of $97,550, and a judgment was entered on March 26, 1963. Thereafter, the appellant filed a motion for a new trial, setting up in said motion substantially the same grounds which are now assigned as errors. The motion for a new trial was overruled by the circuit court, and from which the appellant prosecutes this appeal.

The record shows that the appellee is the owner of approximately 895 acres of land in Pearl River County. This land is located on a public county road approximately two and a half miles southeast of the Village of Carriere, where there is located a new school, a post office, a few stores and places of business. The ap-

pellee's property is also located approximately three miles north of the city limits of Picayune, Mississippi, and is about five miles north of the buffer zone of the National Aeronautics and Space Administration Mississippi Test Facility. The record discloses that this new highway for which the right-of-way was being acquired is a limited access four lane highway running from Meridian in a southwesterly direction to the cities of Laurel and Hattiesburg, and then southwesterly along the route laid out by the State Highway Commission to the City of New Orleans. This road goes through or close by the Village of Carriere and the City of Picayune, Mississippi.

The record shows that the 895 acres of land is located in Secs. 20 and 29, all in T. 5 S., R. 16 W., of Pearl River County, Mississippi. The application for condemnation of the above-mentioned four-lane strip of land for right-of-way purposes of the new highway was to enter the appellee's land in the S½ of the SW¼ of Sec. 20, and proceeding southerly through the NE¼ of the NE¼, the W½ of the NW¼, and the NW¼ of the SW¼ of Sec. 29, T. 5 S., R. 16 W., Pearl River County, Mississippi. The record discloses that the eastern boundary line of New Highway No. 59 extends through the appellee's property a distance of 5,333 feet. This extends from the south end to the north end on the east side, which is the longest side of the highway going through appellee's property. The western side of the fourlane highway, extending from the south to the north, extends a distance of 4,562.4 feet. Therefore, the eastern boundary line of the appellant's highway is more than a mile in length, while extending through appellee's property. This property of the appellee does not front on any main or hard surfaced roads but does have a small amount of frontage on a gravel road over the east side, where a portion of the property projects out to the east of the road. The record discloses that the appellee owned a valuable

tung and cattle farm and that he had also merchantable timber in a smaller amount of the land devoted to timber raising or to a timber farm. The appellee does not live on this farm but resides in Picayune, Mississippi.

The record discloses that prior to the time the highway came through appellee's land, that of the 895 acres, 445 were in tung trees; that the average age of these trees was ten to fifteen years; that he had what he considered a perpetual growth because as old trees died or were injured by lightning or otherwise, he would replace them. The average bearing time for trees is about twenty years. The tung trees were of three types, L-2's, 51's and 47's. The ground was highly cultivated and fertilized before the selective trees were put out, and they were planted approximately a hundred to a hundred and twenty-five trees per acre. A hundred to a hundred and twenty-five trees seems to be the maximum for productivity on land such as the appellee has. The soil of this land was the Orangeburg and Ruston type. It had good drainage facilities and was the best type for growing tung trees and for pastureland. The appellee's entire place was fenced with a net wire, topped with barbed wire on the outside, and with barbed wire cross-fences. The appellee had constructed service roads throughout his farm in such a manner that all parts were easily accessible from the remainder thereof. These roads were built for the purpose of moving cattle, and for collecting nuts from the tung trees and moving them by wagons as quickly and as expediently as possible, so as not to interfere with the cattle-grazing operations. The record shows that he had approximately five hundred head of cattle grazing on this land and of the 895 acres, 365 were in improved pasture of red clover, white clover and bahia. The record discloses that the appellee had had his entire farm analyzed insofar as the chemical make-up of the soil was concerned and, from his own personal experience of over thirty-seven years of ac-

tually engaging in agriculture or horticulture, he had produced or had built a very fine pasture and a very fine tung tree farm. It was drained, fertilized, terraced and prepared as well as any farm and pastureland could be prepared.

Of the 895 acres of land, 85 acres were in timberland, which consisted of pine and hardwood, the hardwood being mostly gum and poplar, all of which appellee testified was merchantable.

On the 365 acres in improved pasture was a dwelling house which consisted of three bedrooms, one of which was 16' x 16', and the other two were 14' x 14', each having a big closet; there was a hall, a bath and a partial bath, utility room, living room with fireplace, kitchen and dining room. There was a breezeway, and a porte cochere with storage space. There was an attic fan, electricity, and gas heaters to supplement the fireplace in this house. The house was approximately three years old. It is located on the extreme, middle, southeast portion of appellee's land. The highway appears to divide appellee's land into two parts, two-thirds of which lies east of Highway 59 and one-third to the west, north and northwest. In addition to the house, appellee has on his land one barn 24' x 150' which is an equipment barn, a second barn 40' x 80' with a drop shed 20' x 80', and a third barn 40' x 60', and a fourth barn 40' x 35'. There were seven stock ponds on appellee's land, all of which will be cut off from the one-third western and northwestern part by the construction of Highway No. 59. There were net wire fences outside and principally barbed wire cross-fences. There were service roads, which were constructed so that heavy trailers could be used over them in order to haul the tung nuts; and the cross-fencing was put in in order that the property could be handled most economically from the standpoint of cattle, and in connection with the collecting of the tung nuts or the handling of the tung trees. There were pens

in which to spray the cattle and also pens in which to doctor them.

The record discloses that the highway will separate on the west side thereof 252.71 acres, 174.71 acres being in tung trees, 15 acres in improved pastureland, and 63 acres in timberland. The record discloses that 252 acres of this land will be landlocked, in that it will not be possible for the appellee to go upon it because of limited access Interstate Highway No. 59. It appears that in order to get to this land the appellee will have to travel over a circuitous route of county roads, and he does not have any roads going into the portion of his land west of Interstate Highway No. 59, which enters it from the west or the north side. It appears, therefore, that these roads of necessity will have to be constructed if the appellee is to utilize any of this land located west of the Interstate Highway No. 59. Highway No. 59 separates 606.84 acres to the east, which is composed of 344 acres in improved pasture, 240.84 acres in tung trees, and in the improved pasture are the stock ponds, the local plantation roads and 22 acres of timberland. This 606.84 acres is left on the east side of the road which is accessible to the appellee and over which his plantation roads extent and which he can still use. It appears that new fences will have to be built, as well as cross-fences and stock pens. It appears that his two main ponds will be injured or destroyed by the building of the new highway. The total number of acres being taken by the highway, including the easement, is 35.92 acres. The dwelling house and the other improvements were used by the overseer or manager who lived on the farm and managed the farm for the appellee.

After the jury verdict of $97,550 was received and entered and after a judgment had been entered thereon, appellant filed a motion for a new trial, alleging its grounds therefor (1) that the verdict of the jury is excessive and not based on credible evidence; (2) that

the verdict of the jury is so excessive as to denote bias and prejudice on the part of the jury; (3) the verdict is against the great weight of the evidence and not supported by a preponderance of the testimony; (4) the verdict is against the law and the evidence, and not supported by the evidence, and which is actually contrary to the law and the evidence; and (5) there is no credible testimony in the record which supports the verdict. Other grounds for the motion for a new trial related to the exclusion of certain evidence offered in behalf of petitioner and objected to by defendants, and the admission of certain evidence offered in behalf of defendant over the objections of the petitioner, and because the court overruled the motion denying the petitioner to exclude the testimony of the four witnesses, including the appellee's testimony, for the reason that it showed that the testimony was not based on proper considerations insofar as estimating the before-and-after value of the property taken; that these witnesses, including the appellee, were not competent to testify as to the value of this property because it was shown that their opinions were not based upon any qualified sales of property which was located in the community and was comparable in size, use or location. The other motions for a new trial related to introduction of testimony or the refusal to permit testimony to be offered, the material parts of which can be and will be later considered herein.

From the judgment and order overruling the motion for a new trial, the appellant prosecutes this appeal and assigns as error the action of the trial judge in overruling its motion for a new trial and also other errors which will be considered later in this opinion. As laconically as possible, we will outline the pertinent parts of the testimony offered by petitioner-appellant and by the defendant-appellee.

Joe R. Davis, Civil Engineer of the State Highway Commission, was the first witness to testify for the appellant. It is his office which handles the construction of Interstate Highway No. 59 through Pearl River County, Mississippi, which traverses the appellee's property. Davis testified that 607.55 acres would be left on the east side of the right-of-way. He testified that he had been over the property of the appellee involved in the litigation; that he had gone over the entire property. He testified that beginning at the south end of the road as it entered appellee's property, the right-of-way would start with a one-foot fill; at station 943 it would have a two-foot fill; at 944+50 there would be a seven-foot fill, and that the fill would then decrease at station 947, at which it would not have any fill at all. There it would start again and increase to about a six-foot fill at station 960 and would level off at 963 with no fill. At 964+50 or at 965 it would have a seven-foot fill; at 970 it would be even, with no fill. It would have a four-foot fill at 972 and would run an average of three or four feet to station 979. At 978 it would have a four-foot cut, and at station 979 it would have no fill at all. Thereafter a fill starts at 980 and that would amount to about a four-foot fill, and there it would continue through the rest of the property until it left the property on the north side on a five-foot fill. 35.45 acres of land were actually for use by the Highway Department, but considering the easement, it would amount to 35.92 acres. This was admitted on cross-examination; also, that there would be located on the west side of the highway 251.5 acres. On cross-examination this witness admitted that the highway was 300 feet wide as it starts on the south to station 953; at 954 it would increase to 320 feet, and continues 320 feet to station 957. At station 959 it would become 335 feet wide and continue at that width to station 962. At station 963 it would decrease to 320 feet and continue almost to station 970, where it would

increase to 340 feet wide. At station 976 it would decrease to 320 feet wide and at station 977 it would be 300 feet wide as it leaves the property of the appellee. On the east boundary of the right-of-way the distance through appellee's property is 5,333 feet. On the west side it is 4,562.4 feet. Davis conceded that the upper end of the lake on appellee's property would be filled in. The fill there would be seven feet high, silt would be washing into the lake, and they would have to put in a thirty-inch drain pipe there which would drain approximately eleven acres. Another drainage pipe north of that on the west side at station 972, would be an eighteen-inch pipe. Davis conceded that they would dam up the end of the lake to keep the water from backing up to their fill on the roadbed, that this would be a permanent structure, and that in order to do so they would have to take a part of this lake. Davis conceded that on June 29, 1962, the Highway Department had gone upon the property. Davis conceded that the appellee owned 894.5 or practically 895 acres. Witness Davis also testified that there would be no direct access from the east side of the highway to the west side by appellee. Davis testified that the 251.5 acres located on the west side could not be reached from the east side, nor could the 607 acres on the east side be reached from the west side, by traversing Interstate Highway No. 59. Davis admitted on cross-examination that the property was fenced and cross-fenced with net wire and barbed wire on the top; that there were crossroads in the property and across the property which were used by the appellee; that across appellee's property after the location of the interstate highway, there would either be cuts or fills at varying heights and depths; that most of the land on the right-of-way was in tung trees and some was in bahia pasture, and a small part was in pecan trees. This witness did not on direct or cross-examina-

tion estimate any value of the land before or after the taking for the right-of-way of the petitioner.

J. W. Morgan was the next witness offered by appellant. He is a professional appraiser employed by the Commission, who testified that he is a graduate of Mississippi State College in Agricultural Education, and had taught agriculture for about eight years. He had had two special courses in appraising real estate. He owned and operated a farm at Moselle in Jones County, which is located about twelve miles north of Hattiesburg and about eighty miles from appellee's property. Morgan testified that he had made appraisals of real estate in Pearl River County. In his opinion, the fair market value of appellee's property before June 29, 1962, the date of the taking, was $316,000; that after the taking, $288,000; that his estimate of the damages was $28,000. Morgan testified that approximately 252 acres would be left on the west side of the right-of-way and 607 acres on the east side thereof. It was this witness who introduced petitioner's Exhibit 2 which accurately describes or illustrates the right-of-way of appellant through appellee's lands and the various portions thereof which are divided thereby. The appellant endeavored to prove by this witness that he based his before-and-after taking value and the damages resulting from the location of the right-of-way from the recent sales of comparable property. The lower court, however, declined to let the appellant or the appellee show on direct testimony any values testified to by the witnesses which were based upon the sales of comparable property. The lower court did permit this to be brought out on cross-examination, but not on direct examination in chief. The lower court refused to let the petitioner, through Mr. Morgan, introduce an aerial photograph. This was introduced in the testimony of the case of State Highway Department v. W. R. Roche but is introduced here for identification only. Roche's property is located immedi-

ately north of appellee's property. The aerial photograph or map does not show all of the appellee's property in question, some 75 to 100 acres being left out. The photograph was also objected to for the reason that it did not reveal all of the property of defendant, it was not made by the witness offering it, the boundary lines to the property were not clearly shown, it failed to show the improvements located on defendant's property in sufficient detail, one of the aerial maps was made in 1958, approximately four and a half years before the taking of the property in the eminent domain proceedings on June 29, 1962; and, finally, for the reason that there are a number of markings and lines drawn on the maps and names inserted thereon which admittedly were placed or drawn there by this witness or by the section of the Highway Department which made the aerial photographs. After the court sustained the motion of the appellee to exclude the photographs, on cross-examination this witness testified that in the eminent domain trial he had stated that there is no land which compares with that which appellee owns; that no one has ever bought any like this; that they just estimated it; that all tung land is not alike; and that this is one of the better tung orchards. The witness admitted making the statement that there was no comparison, that no one had ever bought any land of this kind. He admitted also that he was not a duly licensed real estate agent in Mississippi and that he had never bought or sold a foot of land in Pearl River County.

Charles B. Moore was the second witness to testify for the State Highway Commission concerning the value of the land before and after the taking. He is an employee of the Commission, and had been for two and a half years. Moore testified that he was a licensed real estate broker, that he had been with F. A. Anderson appraising and buying farm property for the International Paper Company and the Mississippi Power &

Light Company; that he had made an appraisal of the appellee's property and he had made this appraisal based upon the sales of comparable property. It was his opinion that the fair market value of the appellee's property before-the-taking was $330,400; after-the-taking $300,775; that his estimate of the damages was $29,-625 "to round out" between these two figures. Again the trial court declined to let this witness specify the particular sales of comparable property upon which he based his estimates. The record discloses that this witness estimated the appellee's farmlands of 894 acres; that 250 of these acres would be landlocked on the west of the right side of the highway; that the land on the west side of the highway was across from the farm manager's home; that he considered the reduced value of the property at the time of the taking as compared to the value of the property before it was taken. Upon cross-examination this witness for the appellant was questioned with reference to the comparable sales of the Benton Pigott place which was sold to Sam Dyer in 1961 that was very close by. He was questioned with reference to the Harrison Penton place which was in the neighborhood, and which was sold to Mr. Charles F. White in 1961. He was questioned with reference to the sale of 28 acres on January 6, 1960, by Mr. Vaughn to Lloyd Rittiner. This witness testified that the Benton Pigott place was comparable but that the appellee's place was better. This witness admitted that he raised the price of appellee's place because he had a better tung orchard, better pasture, better fences, better improvements, and a larger tract of land. The witness admitted that he did not know many people who would be able to buy such a farm as the appellee had. This witness admitted that he lived in Amite County; that he lived about 130 miles from Pearl River County; that he had never bought or sold any land in Pearl River County; and that all that he had learned about

Pearl River County property he had learned since he had been appraising for the Highway Commission in Pearl River County, which was for a period of about two years on the same project.

F. L. Albogast, the third witness introduced by the appellant, testified that he lived about four miles west of Carriere, where he owned a farm containing approximately 230 acres, which was used for raising cattle and tung nuts. He had owned the place since 1943; he was a licensed real estate broker, and had been engaged in the real estate business since 1954. He stated that he had appraised property for the Veterans Administration, the F. H. A., the Mississippi Savings & Loan Association, of which he was the manager, and other agencies. He had also made appraisals for landowners for condemnation purposes. He stated that in his opinion the value of appellee Pepper's property before-the-taking was $338,830; after-taking $308,220; and that the damages amounted to $30,610. He was asked, in substance, whether or not in making his appraisal of the appellee's property, he investigated sales that had been made recently of other property comparable to the appellee's property and in the vicinity thereof. He replied that he had considered tracts, and named Harrison Penton's tract which was sold to Charles F. White; the Pigott tract which was sold to Sam Dyer in March 1961. In January 1962, Clarence Shaw, et ux., sold to C. W. Harwell approximately 1,000 acres for $115,000. This property is located thirteen miles northeast of Picayune and lies on a paved blacktop road, and most of it is in tung grove. This witness admitted that Exhibit 2 introduced by the appellant was not correct in certain particulars. This witness also stated that he started out comparing land which was comparable in topography, size and location with 80-acre tracts and finished up with a 1,000-acre tract, — the 80-acre tract, the 200-acre tract and the 1,000-acre tract of comparable properties

— these tracts being the Penton to White property, the Pigott to Sam Dyer property, and the Clarence Shaw, et ux., to C. W. Harwell property.

Carl Cooper was the fourth witness to testify for the appellant. He testified that he was a licensed real estate broker, that he operated in Pearl River and Hancock Counties, that he held a BS degree from Mississippi Southern; that he had training under the Houston Chapter of the American Institute of Real Estate Appraisers at Rice University; that he had made appraisals of real estate for insurance and oil companies and other clients, including owners of land through which interstate highways ran. He stated that his estimates of the value of the Pepper property before-the-taking of the strip of land for the highway right-of-way was $319,000; after-the-taking $286,200; that his estimate of the damage was $32,800. Cooper testified further that when he made his appraisal of the property he took into consideration recent sales of comparable property in that area, including the sale of the Benton Pigott place, containing approximately 200 acres, which had been sold to Sam Dyer in March 1961 for $42,000; and the property known as the Harrison Penton place, containing 87 acres, which he had sold recently for $22,500, including the growing tung crop and equipment. The Harrison Penton place was located in proximity to appellee's land, but fronted on a blacktop road and was closer to Carriere. There were tung trees on about 45 acres of land. This witness admitted that appellee's place was one of the best, and one of the best-managed that he knew, and that he had taken that into consideration in making his appraisal. He testified though that he had managed a tung oil farm, that all of his experience had been obtained with the experiment station where he had worked at the Pearl River Junior College, as a student when he was working his way through college. This witness admitted that appellee's trees were

in a fine state of production; that he had a fine farm— a show farm; that it was a money-making farm and that it was operated to make money and that it was making money; that on the Harrison Penton place there were only about 45 acres in tung trees; that this applied to the sale of 1,328 acres in May 1960 by W. A. Alexander to some preachers of New Orleans. On cross-examination it was developed that this property brought $132,000. It was known as the Hillcrest Farm. This witness admitted that on the Penton place the tung trees were older; that Pepper's tung trees were of a newer variety, but that the soil was basically the same type throughout all of the area. This witness admitted that the Pigott place did not have the quality of tung trees that appellee's place had; that some of appellee's pasture was superior to the other pastures he had considered. On re-cross-examination, he admitted that no two places were just alike; that you would find differences and would have to take those differences into consideration and make adjustments.

After placing Civil Engineer Dan Hillman upon the stand, who testified that except for the clearing of the right-of-way and the moving of the trees, that the land was exactly the same as it was prior to the time the Highway Commission entered upon the land, the appellant rested.

Appellee Pepper then testified in his behalf that he lived in Picayune; he had lived in Pearl River County for thirty-seven years; he was a graduate of Mississippi A. & M.; and he held a degree in Agricultural Horticulture. His lifework had been the study of fruits, vegetables and nut crops; he was a specialist in agriculture and had been engaged in it since he had been in Pearl River County; he planted the first nursery in Pearl River County and had managed 40,000 acres of tung nuts for ten to fifteen years; and he had been on the Crosby payroll and took care of groves for different

people in the county. In great detail, the appellee described how he had fertilized, planted, harvested and taken care of the various crops of tung nuts, raised cattle and improved the pastures on his farm. He dealt with the upgrading of the soil, the preparation thereof by fertilization, cultivation and drainage. He testified at length as to the type of tung oil and crops which he had which grew on the Orangeburg and Ruston types of soil. He testified that his tung and cattle farm was located about two and a half miles southeast of Carriere, about three miles north of the city limits of Picayune, and about five miles from the buffer zone of the Mississippi Test Facility Area; that he had 445 acres in tung trees; and he had selected the 895-acre tract of land because of its topography, character, location and quality of soil. He used the Ruston soil for his pasture and the Orangeburg soil for the production of tung trees. He used three types of tung trees, L-2's, 51's and 47's. He testified that his oil tonnage was good and the oil content was high; his trees were hardy; the average life of his trees was fifteen years; he put 120 to 125 trees per acre; and he received approximately two tons per acre from the trees. He testified that he had a perpetual growth of tung trees on his land. He grazed approximately five hundred head of cattle on the 365 acres in pasture, and ponds and barns. The pastures were composed of crimson clover, white dutch, bermuda and bahia, depending upon the type of soil. He estimated the value of this place before-the-taking at $489,125; the value after-the-taking to be $343,351.15; so that the damage, or the difference between the before-and-after-taking value was $145,773.85. He based his estimates upon the following facts: To begin with, there were 895 acres of land, 445 of which were in tung trees, 85 acres were in timberland, and 365 acres were in improved pastureland. The timberland had merchantable timber; and on the pastureland there was a dwell-

ing house with three bedrooms, a master bedroom 16' x 16', and two others 14' x 14' each; a tile bath and a partial bath, utility rooms, living room with a fireplace therein, kitchen and dining room, breezeway and porte cochere with storage space. It was also wired for electricity, had gas heat and a telephone. On his place there was one huge barn, 24' x 150', an equipment barn; a barn 40' x 80' with a drop shed 20' x 80'; a barn 40' x 60'; a barn 40' x 30'; seven stock ponds; wire fences outside and cross-fences, principally barbed wire cross-fences; and service roads which he had constructed throughout the farm so that any portion thereof was accessible from almost any other portion. This was necessary in hauling the tung nuts so that the cattle would not trample them, and the cross-fencing was put in to prevent this. There were pens in which to inspect the cattle, and pens to spray and doctor them. He testified that the highway right-of-way itself was taking 29.45 acres of the tung land, and by easement they were taking .47-acre of the bigger pond and 6 acres of the pastureland. He testified that the highway right-of-way went through the very best land for tung trees which he had, some of the best drained land, and some of the best soil; and that the most productive trees were in this area. The highway, he stated, cut off fifteen acres of improved pastureland on the west side which is landlocked, that is, it is inaccessible, there are no roads going into it except from the east side, and one cannot cross the highway to get to it; he will not be able to get to it at all after the highway has been constructed; there are 63 acres of timberland on the west side of the road which likewise will be landlocked and will consequently be reduced in value; and there are 174.71 acres of tung land that is also landlocked on the west side. He does not own any property adjoining it on the west or north so as to make it accessible by a public road, so the land on the west side is completely land-

locked. This splitting of the property, he urges, reduces the value of the 606.84 acres remaining on the east side. The pond .thereon is ruined because of the change in drainage, the silt which will wash into it; because of dislocating the fences and the pasture with reference to the tung trees and timberland, the rearrangement of the drainage, new fences will have to be built, and the whole farm will have to be rearranged in order that a balanced farm operation can be made of that which will be located on the east side. He originally had more water than he needed on the east side, and now he won't have any water whatsoever on the west side. You cannot operate two farms split in two segments, as this one is, productively, economically and at financial advantage. Further, the total amount actually taken by the highway, he estimated, was 35.92 acres. On the east side of the highway there remains 240.84 acres of tung trees, 344 acres in improved pasture, barns, stock ponds, roads and 22 acres of timberland, making a total of 606.84 acres. There will be 252 acres on the west side of the right-of-way which will be landlocked. The appellee introduced his Exhibit A. This witness testified that 200 acres of land sold by Mr. Benton Pigott to Sam Dyer were not comparable to his at all. First of all, there were only 30 acres of tung trees on it, and the trees were seedlings, they were not developed; that out of the 200 acres of pastureland, there were only about 30 acres of bahia grass developed pasture; the balance of the land was in swails, hollows and woodland, and there was not a very good stand of timber located thereon. With reference to Harrison Penton's sale of land to Charles F. White, which consisted of 87 acres, he testified that this tract was not comparable either, that it had only 40 acres of tung trees and, in fact, approximately two-thirds of that acreage is an old nursery that had been planted there with an old type of seedlings and were mongrel trees; there was

only about 20 acres of Ruston soil and the rest is heavy and comes nearer being what his pasture was. Insofar as the Hillcrest Farm was concerned, this witness stated that he was familiar with it and that it was not at all comparable. First, it had only 20 acres in tung trees from the standpoint of tung development and pasture; 125 acres of it was in volunteer carpet grass, it is that type of pastureland. It had not been fertilized for years, and neither the fences nor barns had been maintained. There were no cross-fences and no distribution of water. He testified that the land sold by Clarence Shaw to Harwell was 13 miles northwest of Picayune, and this property was not comparable because the trees were planted only about 65 to the acre, they were not new varieties, the production had never been over one ton to the acre; and he had milled the crop and he knew the land and there was very little developed pastureland on it. He had been over the land with some bankers to appraise it and he is familiar generally with tung-cattle farms throughout Pearl River County in the belt area and that his farm, in his opinion, was the best farm for cattle and tung trees in Pearl River County. On cross-examination, it was developed that the Hillcrest Farm was located about two miles from the appellee's farm, and the Harrison Penton place which was sold to Charles F. White is about a quarter of a mile away; but he did not consider any of these farms comparable to his.

The first witness to testify in behalf of the appellee, insofar as the value of the land before-and-after-taking, was O. H. (Ott) Davis. Davis testified that he lived nine miles southeast of Lumberton in the northeastern part of Pearl River County, he is a graduate of the Mississippi State College, with a BS degree. He had had considerable experience in appraising property in Pearl River County for the Farmers' Home Administration. He worked for the Forestry Commission at one time,

and after World War II, he had served as a veterans' instructor in an On-the-job Training Class at the Lumberton Consolidated Line School; and he was familiar with the market value of property throughout the county. He had made appraisals for landowners whose land was being condemned and taken by eminent domain proceedings; and he was familiar with the property which was being taken from appellee, H. H. Pepper. He knew this land prior to June 29, 1962, the day of its taking. He estimated that the value of the land prior to the taking was $475,900, and after-the-taking was $373,324; and that the amount of damages which the landowner was entitled to recover was $102,576. He stated that the land was used for growing tung trees and had an improved pasture and timberlands. It had ample fences to take care of livestock and had ample pasture and grazing hay and feed for winter use. The entire farm was enclosed by a fence of net wire, plus barbed wire on top. There was a nice dwelling there, a new house which had been built in the last couple of years which had three bedrooms, living room, dining room, toilet, pantry and porte cochere; was heated with gas, had a fireplace, and had electricity, hot and cold running water and a telephone. There were numerous other buildings on the property, such as barns for storing food; he described the barns, one being 24' x 150', one 40' x 80' with drop shed; one 20' x 80', one about 40' x 60', and another 40' x 30'. He stated that there were seven stock ponds and some looked like pretty good fishing ponds. He advised that there were 445 acres of young tung trees on the property, good trees of various varieties, consisting of L-2's, 47's and 50's. He said there were 365 acres of improved pastureland, mostly in bermuda, white clover, rye grass, red clover and bahia grass, and that the condition was excellent. He advised that the highway was taking 35.92 acres, and that it cut the land in two and left the west part of

the property so that it would not be accessible. On the east side of the highway, there would be 606.84 acres, and on the west side there would be 252.72; of that amount 174.51 acres were in tung trees, 15 acres in permanent pasture and 63 acres were in timber. This land would be landlocked and could not be reached by appellee from the east portion of his place. On cross-examination, this witness reaffirmed substantially what he had stated on direct examination. When asked whether or not he had based his estimates of before-and-after-taking and the damages upon sales of comparable properties, he advised that there were no such comparable properties, "that there just wasn't any there," that he did not think you could consider 15-acre or 3-acre farms comparable to a farm of this size in quality. He advised that he didn't believe that the 200-acre farms were comparable, and that the farms which had been sold could not be considered valid sales as they were sold under pressure, and were not comparable because they were small and not in the neighborhood. The property that Mr. Pepper himself had purchased for $20,000.00, a farm consisting of 300 acres located about a half mile from his, this witness advised was not a true sale because Mr. Pepper had been kind to a neighbor whose daughter wanted this place sold to Mr. Pepper in order to show her gratitude for the assistance which he had given to her father. He considered the Pigott property adjoining the 221 acres which sold for $42,000 which had the same type of topsoil but was not comparable to Pepper's because of the branches and the heads it made which distinguished it from Mr. Pepper's property. This witness testified he considered every piece of property that he looked at from Pigott's hill over to Highway 51; he did not consider a place which was being fixed for a burial ground comparable to farmland, and he took into consideration the fact that some of the land which was sold between Pepper's place and Carriere, but it

was small acreage two and one-half and three acres, and you could not compare that with appellee's farm. He tried but he could not find any property which was comparable to it. At the conclusion of Davis' testimony, the appellant moved to exclude the same for the reason that the witness did not base his values on recent sales of comparable property, and that the witness' testimony on the face shows that he is not qualified to appraise this property since he stated he did not consider other sales because they were not identical in shape, size and character, and therefore were not considered at all; and that apparently this witness had grabbed the values out of the air without any proper basis whatsoever, and the values stated by him did not represent the fair market values but were mere speculation; and furthermore that the witness had not been shown to be qualified to appraise real estate in general. This was overruled by the court, and the same objection was substantially made to each witness which was offered by the appellee in support of his valuation of the damages sustained by him because of the acquisition of the highway by the Highway Commission. Each of these objections were likewise overruled.

C. E. Barefoot, the next witness offered by appellee, testified that he lives in Pearl River County, that he had served as a High School Superintendent, taught four years in Mississippi Southern College and Pearl River Junior College; that he had served with the Vocational Rehabilitation Division of the State Department of Education for eighteen years, lacking four months; that he was a licensed real estate salesman and had been engaged in the real estate business since January 1962; he had appraised farm and business properties and investigated the sale price of lands all over Pearl River County. He stated that he had appraised the Pepper property on June 16, 1962, and in his opinion the value of the Pepper property prior to the taking

of the right-of-way, of 35.92 total acreage, was $437,315; that the after-the-taking value of the property was $323,360; and that the damages amounted to $113,955. In giving the reasons for his evaluation prior to and subsequent to the taking, this witness described the 445-acre improved tung tree pasture, the 85 acres in timberland, and the 365 acres in improved pasture on the east side of the right-of-way. He considered the barns, the large barn 24' x 150', the barn 40' x 60', and the barn 40' x 80'. He noted that there was timber growing on the land suitable for good poles and piling and would make turpentine boxes. He found that there were seven ponds and that all of the property was fenced; he found a large 8-acre lake, the six small ponds, some of which were larger than others and that they would average two-thirds of an acre each. The tung trees he described and stated were in good condition. The bahia, white and crimson clover, bermuda pastureland was likewise outlined. The Orangeburg and Ruston soil, he likewise valued. The 35.92-acre total which was taken by the Highway Department embraced 29.45-acres in tung trees, six acres in improved pasture, and .47-acre easement that was in the pond. He estimated that approximately 9,900 feet of fencing would have to be rebuilt. He estimated 174.71 acres of tung trees would be landlocked, also 15 acres in pastureland and 63 acres in timberland would be isolated. He considered that the place was cut in two and that the farm was therefore made smaller, and that this would reduce the value of the east side, irrespective of the loss of the fences and the ponds. On cross-examination, it was developed that during the five-year period of time Barefoot had sold approximately a quarter of a million acres of land; it was his business to buy and sell land; he was Camp Commander for the CCC's; he was a licensed broker of real estate, was licensed under R. W. Hinton of Lumberton; and he had made seven or eight business sales around Poplar-

ville. This witness outlined the eight items which he considered in arriving at his before-and-after-taking values. He testified that he could not compare the values of any comparable property sales because no comparable property could be found; and it was true that some property had been sold, but it was not comparable to this property. This witness admitted that the Benton Pigott place adjoined appellee's land, and that the southeast corner joins the appellee's northeast corner, making it lie northeast of Pepper's place. He did not consider the Caroline Luper Berringer place which was sold in 1962 for $20,000, but admitted that it was a half mile northwest of the Pepper place; and he considered the Charles F. White place, which is about a quarter of a mile north of Mr. Pepper's place, but it was not at all comparable to appellee's place because a great deal of it was in swamp and was rolling land, it was not improved, a greater percent was in swamp and low places, and the tung patches were not comparable. He stated that the places that have been called to his attention, he considered too small and could not be properly evaluated with the appellee's land. He stated that he did consider the Harrison Benton land which was situated about one-quarter of a mile north of appellee's place, which was sold to Charles F. White, that after the sale had been mentioned, he examined the record and later inspected the property and he saw no reason for considering it as being comparable to appellee's land. He stated that he did take into consideration the Benton Pigott sale to Sam Dyer which joins the Pepper place; after the sale he inspected it and found that it contained forty acres of swampland, had a little timber on it, but it was not the kind of land that could be sold for much money. This witness attempted to explain the difference between market and real value, and it appears that he comprehended the difference, but oddly enough this witness answered when asked, ''What kind of value did

you put on it, on Mr. Pepper's place?'', he replied ''The market value, — mostly real value, I would say.'' The market value being what it would bring when neither the vendor nor vendee were under any compunction to sell or buy, and the real value being what it is really worth.

The third witness who testified for the appellee was Ferris E. Tate, and he said he was a lifetime resident of Picayune, and had been engaged in the real estate business for thirty-five years, maintained a real estate office in the name of Tate Realty Company, had his home in Picayune; he had made appraisals of various properties all over the county, and had made appraisals in connection with the taking of rights-of-way for Interstate Highway No. 59. He stated he was familiar with the market price of lands all over the county. He stated that he had inspected the H. H. Pepper land prior to June 29, 1961, and that he had made two or three inspections since the time of the taking. He estimated the value of the appellee's property before-the-taking to be $445,621.50; and after-the-taking $332,867; and the damages he estimated to be $122,754. On redirect examination, this witness stated that he had two tracts referred to him as land which had been sold for $1,000 per acre, one of which was a two and one-half-acre lot sold by J. C. Ford to the Central Service & Supply Company for $2,500 on March 23, 1962, and a three-acre lot which was sold by J. S. Lumberton to Carl Carson on July 7, 1962, for $3,000. He also mentioned the sale of a two-and-one-half-acre lot by Max Mitchell for $3,500, but on cross-examination it developed that there was a dwelling house on that lot at the time Mitchell bought it, and it could be made into a small farm. Tate stated that he had gone over the Benton Pigott place but made no inspection of the Pigott home; and he did not consider the sale of their property when he made his appraisal of the Pepper property; and the Mitchell place sold for $800 to $900 per acre. This wit-

ness gave a good account of himself on cross-examination, i. e. in stating that this was one of the nicest places he had ever seen, he advised that he had been all over the United States and Europe looking around. In making his valuations, he took into consideration everything which was on the Pepper place, and the effect thereon of the highway's right-of-way going through it. It was really difficult to compare appellee's place with other places because there was such a great disparity between them, that the appellee had taken advantage of all of his great knowledge in agriculture and that he had. gone about building up a very fine place. On cross-examination, this witness stated that J. Mitchell had been offered $800 to $900 per acre for his place, which would make appellee's tung oil property a lot more valuable because there were swamps and creeks on the Mitchell place. With reference to the Caroline Luper Berringer sale to Mr. Pepper of 300 acres for $20,000, this witness testified that this was done because Mr. Pepper had taken care of that property for Mr. Rupel or for Mrs. Rupel, and that this price was given in consideration thereof, and that they need the money, were in distress for money, and therefore sold the place; and that it was not a valid sale for the market price. On cross-examination and redirect, the comparison of the properties which had been sold and the appellee's property were made insofar as before-and-after values and damages are concerned.

The last witness to testify on behalf of the appellee was E. F. Loe. This witness testified he graduated from Louisiana State University with a forestry degree in 1938. He has lived in Picayune for 17 years and that he was operating a real estate business under the name of Ford and Loe Realty Company. Witness Loe stated that he made an appraisal of the H. H. Pepper property for the owners before June 29, 1962. He stated that he had sold approximately a million

dollars worth of property, of real estate, each year during the last five years. He had made appraisals for life insurance companies, the Bank of Picayune, oil companies and for various individuals; he was familiar with the price and sale of lands all over Pearl River County; he knew the fair market value of Mr. Pepper's property before-the-taking and he fixed it at $420,435, after-the-taking he estimated the total fair market value of appellee's property to be $298,172, and therefore estimated the damages appellee would suffer as the result of the taking to be $122,263. He described in detail the house, the barns, the roads, the acreage in tung trees of 445 acres, the 85 acres in timber and 365 acres in improved pasture on the east side. He described the west side, which is landlocked; described the pasturelands, noted the fences, the cross-fences, the stock ponds, the several miles of roads and the timber. He took into consideration the 29.45 acres of tung trees taken by the right-of-way, the six acres of improved pasture and easement, and the 214 landlocked acres of tung trees which were west of the highway. He considered also the 15 acres of landlocked improved pasture west of the highway, as well as the 22.86 acres of timber landlocked thereon. This witness introduced a map showing the Mississippi Test Facility in location to the Pepper property to the zone of this Test Facility over the objection of the appellant. This is defendant's Exhibit E. On cross-examination, this witness stated he did not know of any property, similar and comparable to appellee's which had been sold recently. He did not know of a sale that was comparable to this particular piece of condemned property owned by appellee. He did know of properties which sold as high as $1,000 an acre in the general vicinity, and he used those just as adjusted values, citing F. S. Lumpkin's three acres which was sold on July 7th for $3,000 and the J. C. Ford property of two and one-half acres which sold

for $2,500. He was not familiar with the sale of Gonzales to Spears. He knew of the property but he did not know about the sale, and he did not consider it comparable at all to appellee's property in any respect. He did not believe that the sale of the F. S. Lumpkin property to Carl Carson, which was a three-acre pecan grove on the south side of Carriere and west of the new road, was comparable at all. He stated he handled the sale of the Ben Pigott place to Sam Dyer. This place joins appellee's property to the northeast, consisting of 221 acres. He said that this property was not comparable in the least to appellee's property. Furthermore, it was sold before the location of the Mississippi Test Facilities, that values have changed considerably since that time; and the property had a lot of swampland on it, and only a few tung trees which had never been profitable. He estimated that the nut production from appellee's tung trees, of which he was familiar, would average two tons to the acre, at an average price of $150 per ton, so that the appellee would average a proft of $300.00 per acre from his tung trees. He stated that the sale of the Harrison Penton property to Charles F. White a quarter of a mile above Mr. Pepper's place was not comparable; that there were low grade tung trees on it, a very little pasture; there were some branches on it, and there was a considerable difference in the soil; that that farm had never been taken care of and was not a highly improved farm, or considered as profitable farm as appellee's. He also stated that the Caroline Luper Berringer property sold to Mr. Pepper during 1962 for $20,000 was not a true sale. He was familiar with the situation, and this sale was made because Mr. Pepper not only had taken care of Mr. Rupel for about 17 years but the tung grove also, that they lived next door to him, and Mr. Rupel's daughter appreciated appellee's kindness and wanted him to have the farm. In arriving at the damage, this witness

stated that he considered the 29.45 acres in tung trees taken by the highway, the six acres in improved pasture taken by the highway, the landlocked 214 acres of tung trees west of the highway, the landlocked 15 acres of improved pasture west of the highway, the 22.86 acres of timber, long leaf pine, landlocked west of the highway, and he considered 607.58 acres that would be left east of the highway which would be reduced somewhat in value. He considered the fact that Pepper would have to build 9,900 feet of fence on each side of the highway, and he considered the .47-acre easement taken off the west end of the lake. These were the factors which he considered in determining that the damages would amount to $222,263.

The instructions granted to both the appellant and appellee correctly state the law under the facts of the case at bar. The jury brought in as aforesaid, a verdict of $97,550, judgment was entered and thereon and appeal taken therefrom. Appellant's attorneys have assigned and argued two main points as grounds for reversal of the judgment of the lower court. These grounds are (1) that there is no credible evidence in the record to support the verdict of the jury; and (2) that the verdict of the jury was so grossly excessive as to denote bias and prejudice and as to shock the enlightened conscience of the court. These errors we will consider. It is also urged that four witnesses for the appellee, upon whose testimony the verdict appears to some degree to have been based, by their testimony established the fact that they were not qualified to express a competent opinion as to the before-and-after-taking of the appellee's property, or the amount of damages which should be awarded to the appellee, whose land was being taken for public use. The other errors which also have been assigned and argued as grounds for reversal of judgment, and which relate to the admissibility or exclusion

of testimony, we do not feel it is necessary to consider in this opinion.

We are convinced that the verdict of the jury is grossly excessive, in fact so excessive as to require a reversal of the judgment. We list below the names of the witnesses who testified for the appellant with the valuation of appellee's land before-and-after-the-taking, and also the resultant damages. Below this digest we list a similar one for the appellee, and for the appellee's witnesses.

| Appellant's Witnesses | Before Taking | After Taking | Damage |
|---|---|---|---|
| J. W. Morgan | $316,000.00 | $288,000.00 | $28,000.00 |
| Charles B. Moore | 330,400.00 | 300,775.00 | 29,625.00 |
| L. L. Arbogast | 338,830.00 | 308,220.00 | 30,610.00 |
| Carl Cooper | 319,000.00 | 286,200.00 | 32,800.00 |

| Appellee's Witnesses | Before Taking | After Taking | Damage |
|---|---|---|---|
| O. A. (Ott) Davis | $475,900.00 | $373,324.00 | $102.324.00 |
| C. E. Barefoot | 437,315.00 | 323,360.00 | 113,955.00 |
| Ferris E. Tate | 445,621.50 | 332,867.00 | 122,754.50 |
| E. F. Loe | 420,435.00 | 288,172.00 | 122,263.00 |
| Appellee | | | |
| H. H. Pepper | $489,125.00 | $343,351.15 | $145,773.85 |

It is astonishing to note the vast gulfs of difference between the respective appraisals of appellant's and appellee's witnesses. It is incomprehensible that reasonable men, who are unbiased and qualified to make impartial appraisals can objectively be as far apart in their deliberate conclusions as is reflected in this schedule. There is a strange uniformity of irreconcilable disparity in values evidenced by the estimates made by these two groups of appraisers. The great difference between the values and damages estimated by the appellee and his witnesses alone is persuasive that the testimony relating to the appraisals is lacking in probative value to justify the verdict of $97,550.00. On the other hand, the negligable differences in value and

damages as reflected in the estimates of the appellant's witnesses presents a remarkable low uniformity when compared with the appellee's and his witnesses' estimates. The mean or average damage valuation of all the appellant's witnesses is $30,258.75; while the mean or average valuation of damage by the appellee and all his witnesses totals $121,422.07. In passing, if appellant's mean damage estimate of $30,258.75 is multiplied by two, and the appellee's mean damage estimate of $121,422.07 is divided by two, the appellant's damage estimate would be $60,517.50, while the appellee's damage estimate would be $60,711.03, thus leaving a difference of $183.53, mirabile dictu!

There was only one witness for the appellee who testified that the appellee's damages was not in excess of $102,324.00. This was witness O. A. Davis who admitted that he lived nine miles southeast of Lumberton, which is approximately twenty-five miles from the property. Witness Barefoot, another resident of Lumberton, like Davis, testified that he did not compare the values of any sales of comparable property, because no comparable property could be found. Admitting that it was true that some property had been sold, and admitting that the southeast corner of the Benton Pigott place joined the northeast corner of the appellee's place, still this witness failed to see any comparable qualities whatsoever. Although the Berringer 300-acre place was but approximately a half-mile northwest of the appellee's land in question, and was purchased by the appellee for $20,000, still this witness did not consider this sale in arriving at his estimated values and damage. He refused to consider the C. F. White place located about a quarter of a mile north of the appellee's land because it was not comparable. He ultimately conceded that after the sale of the Benton Pigott place he inspected it and it could not be compared with the appellee's land. It was this witness who attempted to explain the difference

between market value and real value, and a doubt still remains as to which value he actually used in his computations.

The testimony of appellee's two other witnesses as to values and damages, Ferris E. Tate and E. F. Loe, clearly indicate that the sale of like property in the immediate vicinity of the appellee's land had very little if any bearing on their appraisals. Ferris E. Tate, who was a strong witness for the appellee, admitted that he did not consider the sale of the Benton Pigott property which joins the appellee's property in determining his values of and damage to the appellee's land. He did not feel that the Mitchell place, and the Berringer place, which were in the vicinity of appellee's land could or should be considered as comparable sales. As a matter of fact none of appellee's witnesses could refer to a comparable sale to support and substantiate their appraisals. The testimony of Tate and E. F. Loe concerning the sale by Spencer Lumpkin to Carl Carson of a three-acre building lot fronting on a blacktop highway about two miles east of Carriere for the sum of $3,000, and the sale of a two-and-one-half-acre lot situated in the Village of Carriere by J. C. Ford to Central Service and Supply for $2,500 affords no basis for a valuation of farm property devoted to the growing of tung nuts, pecans and pasturing cattle.

 ██ The factual differences between this case and the case of Mississippi Highway Commission v. Brooks, 239 Miss. 308, 123 So. 2d 423, cited in appellee's brief are plainly obvious. In the *Brooks* case, the 27 acres owned by Brooks was just outside of the corporate limits of the City of Hattiesburg, a metropolis of approximately 34,000 people. The land was located in an area very adaptable for residential development. The proof clearly indicated that the land would probably be used in a reasonable time for that purpose. That is not so in the case at bar. The 895 acres of the appellee is

far removed from metropolitan areas. The record fails to show a present demand for such land for residential or commercial purposes or a reasonable expectation of such a demand in the near future. It is what it has been and probably will be — good farmland. 29 C. J. S., p. 1027, Eminent Domain, § 160; State Highway Commission v. Brown, 176 Miss. 23, 168 So. 277.

The testimony of O. A. Davis, C. C. Barefoot, Tate and Loe as to the value of appellee's property before-and-after-the-taking of the 35.92 acres for highway purposes when considered together with the undisputed facts disclosed by the record was not sufficient to justify the verdict of $97,550.00.

The testimony discloses that the appellee's land is excellent for growing tung nuts and for grazing cattle, but only 35.92 acres are taken for highway purposes. It is true that the land has been severed into two parts by the construction of the Interstate Highway, and it is also true that the appellee will not have access to the 252.71 acres on the west side over the highway from the east side, but this does not mean that he cannot obtain a right-of-way or road into the segment west of the highway. Mississippi has laws of necessity relating to circumstances such as this. There will be an expense entailed to the appellee, but he has not yet permanently lost the use of his land west of the highway if he desires, as he says he does, to use this valuable tract. The jury evidently thought he had completely and irretrivably lost this land.

In view of the foregoing, we hold the verdict of $97,550.00 is so grossly excessive as to evince bias and prejudice on the part of the jury, and the judgment cannot be affirmed by this Court. Miss. State Highway Commission v. Roche, No. 43,060, not yet reported, and the following cases cited therein: Miss. State Highway Commission v. Rogers, 236 Miss. 800, 112 So. 2d 250; Miss. State Highway Commission v. Ellzey, 237 Miss.

345, 114 So. 2d 769; Miss. State Highway Commission v. Taylor, 237 Miss. 847, 116 So. 2d 757; Miss. State Highway Commission v. Valentine, 239 Miss. 890, 124 So. 2d 690.

The judgment of the circuit court is therefore reversed and the case is remanded for a new trial on damages only. However, if within fifteen days from the date this judgment becomes final, the appellee accepts a remittitur of $32,555.00, the judgment will be affirmed as modified; if the appellee does not do so, this case is reversed and remanded.

Reversed and remanded unless the appellee accepts the specified remittitur.

*Kyle, P. J., and Ethridge, Rodgers and Patterson, JJ.,* concur.